# Jackman v. Harry Davis Enterprises Company, Appellant.

*Landlord and tenant—Leases—Theater—Representations as to safety of building—Eviction—Covenant to restore premises to good condition.*

In actions by the lessor of a theater against the lessee for rent and for breach of defendant's covenant to restore the premises to as good condition as at the time of the execution of the lease, defendant alleged that it was induced to enter into the lease by plaintiff's fraud, in stating that the theater was safe, although plaintiff knew that it was unsafe, and that defendant had been evicted by the act of the city in notifying it that the tank on the roof must be emptied and a wall taken down, and by proceedings by an adjoining owner for the erection of a party wall under which the wall of the theater was in fact taken down. The lower court, trying the case without a jury, found that plaintiff had not represented the building to be safe, and that if he had done so it would not be fraud, in the absence of any representations of peculiar knowledge on the subject or knowledge different from that which anyone might gain by examining the building, especially in view of the fact that defendant inspected the building frequently before the execution of the lease, and further found that the acts of the city and of the adjoining owner were not an eviction. *Held,* the court did not err in entering judgment for plaintiff for the rent due and for the cost of certain repairs and the value of certain fixtures which had been removed by defendant during the term.

Argued Oct. 12, 1916. Appeals, Nos. 113, 114 and 115, Oct. T., 1916, by defendant, from judgment of C. P. Allegheny Co., July T., 1914, Nos. 2142 and 2515; Oct. T., 1914, No. 1436, for plaintiff, on submission to the court without a jury, in cases of Edward F. Jackman v. Harry Davis Enterprises Company. Before Brown, C. J., Mestrezat, Potter, Stewart and Frazer, JJ. Affirmed.

Assumpsit for rent and breach of a covenant in a lease requiring defendant to restore the premises in the same condition in which they were received.

SHAFER, P. J., filed the following findings of fact and conclusions of law:

These three cases were tried together, the two of July Term having been tried for two days before a jury when it was agreed by counsel that all three of the cases should be tried without a jury and the evidence taken before the jury used in all three of them as if taken in each. They are actions of assumpsit, each for a month's rent, the third case being also for breach of a covenant in the lease requiring the defendant to restore the premises in the same condition in which they were received, together with the personal property thereon.

### FINDINGS OF FACT.

1. In 1890 the plaintiff was the owner of a building on Penn avenue, City of Pittsburgh, used for a stable, which had been erected some five or six years before, the front of it having been built with the intention of at some time changing it to a theater. In that year plaintiff had plans drawn for a theater. According to these plans the front was left standing and about fifteen feet of the sidewall at each end next to the street. All the rest of the building was removed, foundations and all. There were used in the reconstruction some of the bricks of the walls torn down, and the iron girders which had supported the upper stories and roof of the stable.

2. On the east side of the building stood a three-story house, the wall of which was on the line between the lots, this wall having been erected before 1885 when the stable was built. The east wall of the theater, except the fifteen feet at the front which was not taken down, was built against the wall of the adjoining house upon a foundation thirty-odd inches in thickness on a cement footing. The new wall was joined to the old fifteen feet from the street by steel anchors, there being a chimney in the old wall at this place. In joining these two walls no attempt was made to dovetail the bricks or make the

wall so that in case the other house should be torn down the seam between the two walls would be covered up in any way. In building the new part of the east wall it was necessary in certain places to vary the thickness of the wall by reason of the wall of the adjoining house somewhat overhanging the line and no attempt was made by the bricklayers to make the wall even where it came against the old wall. In one place, apparently by reason of a window sill or other projection on the other wall, the outside bricks against the old wall were set on their edge instead of on their side, and in general no attention was paid to what would be the appearance of the outside of this wall in case the other wall were taken down. This wall was supported at the front of the stage by a transverse wall or proscenium arch, the wall being some three feet thick, and iron trusses were laid from the east to the west wall and on these the roof was supported.

3. The plans of this building were drawn by competent architects, and the work on it let out to various contractors and the work examined occasionally by an architect employed by the plaintiff. The plaintiff himself was almost every day on the ground while the work was going on. He had no special knowledge of building operations and knew nothing of any defects in the building of the east wall, if there were any.

4. After the completion of the theater it was used for that purpose by a lessee; and in 1902, or about that time, a water tank to contain ten thousand gallons was put up at the rear corner of the building, on the east side, a part of it supported by the rear wall and part by the east wall, this tank being used to feed a sprinkler system installed in the theater.

5. At the end of the theatrical season of 1909, the plaintiff's lessees were in default in payment of rent and he gave them notice to leave for such nonpayment. Anticipating their doing so, he had plans prepared for the renovation of the theater, which included changing of the balconies, or at least of the stairs to the balconies, and

of the seats and the arrangement of the lobby, the principal object of the changes being to increase the safety of the building as a place of public amusement, public attention having been called to that matter recently by a disastrous fire in Chicago.

6. His lessees having given up possession about the middle of July, the plaintiff on the next or following day let contracts to various persons for the making of the changes designed and work was begun on them at once.

7. It having become known that the former lessees had given up the theater, which was known as the Duquesne Theater, one William M. Cooper, a real estate agent, but not in the employ of either of the parties, spoke to the plaintiff about renting the theater and suggested a lease to Mr. Harry Davis. The plaintiff said he would not lease to Mr. Davis, but when called on again and informed that the proposed lessee was the Harry Davis Enterprises Company, a corporation, he agreed to take up the matter of leasing to that company. Thereupon Cooper and Davis came to the theater on several occasions, it being then in the hands of a large number of workmen, and saw what could be seen in that way, and negotiations were so carried on that an oral agreement for the lease of the theater to the present defendant was made sometime in July, 1909.

8. It is alleged by the defendant and denied by the plaintiff, during these negotiations that certain representations were made to the defendant by the plaintiff in regard to the theater. These representations are set out in the affidavit of defense by stating that in answer to inquiries of the plaintiff "as to the condition of the building and its suitability for theater purposes," the plaintiff stated, "that said theater had been made suitable in all respects for theatrical purposes and had been put in a thorough state of repair, and that said defendant could procure a license to operate the same," and that, relying upon such representations the lease was signed. In a supplemental affidavit of defense filed in

the first two cases, it is alleged that plaintiff told defendant that the theater was and would be in all respects and conditions in proper shape for use as a theater and that the defendant could procure the necessary license to operate it, and that he was making extensive alterations and improvements to it, and that it would be in proper state of equipment and repair in every respect, and that thereupon, without making any examination of the structure, the defendant signed the lease. The statement of plaintiff, as testified to by Mr. Davis, is "I am putting this building in perfect condition, safe in every way, and will remodel it after the Maxine Elliott theater on Thirty-ninth street in New York; it will be one of the finest theaters in Pittsburgh, both in safety and contour and in every other way." As testified to by Mr. Cooper, called by the defendant, who claimed to be present at the making of the statement, it was, "He was completely overhauling the building, remodeling it and refurnishing it, doing everything that was necessary to make it strictly safe and first-class as a place for amusement"; adding that he would not allow any prospective agent or tenant to interfere with the improvements he was making. The plaintiff denies ever having had any such conversation, or in fact any conversation on the subject, with Mr. Davis at any time. The testimony of these witnesses is of conversations supposed to have taken place over six years ago. In view of the defendant's omission from the affidavit of defense of any allegation as to statements made to it by the plaintiff in regard to the safety of the building, we are unable to find by the weight of the evidence that any such statement was in fact made, and therefore find that the plaintiff did not, before the making of the lease represent to the defendant that the building was safe. Besides this, if the word "safe" was used by the parties it was understood by them to refer to what is ordinarily meant by the safety of a theater, that is, the facility provided for getting the audience out in case of an alarm. The matter of the strength of the walls of the

building or the strength of any part of the building was not discussed between the parties at all.

9. In the latter part of August a written lease, a copy of which is annexed to the plaintiff's affidavit of claim, was drawn up, and on August 31, 1909, the lease was signed together with several other papers which form a part of the contract. The lease was signed by the plaintiff in the presence of his attorney in a room in the Anderson hotel, and by the officers of the defendant company at their own office, the lease having been sent from the Anderson hotel to that office and brought back signed and there signed by the plaintiff. This lease provided for the defendant taking possession on the first of September. The improvements contracted for by the plaintiff were not yet finished, and an additional agreement was drawn up, that these improvements should be completed by the 20th of September and that no rent should be paid for the intervening time; and in another paper the plaintiff gave to the defendant a list of the contracts which he had with various persons for work on the theater. This lease was for five years at a rental of $40,000 per annum, payable monthly in advance, being $3,333.33 per month.

10. The defendant thereupon went into possession on September 20th and occupied and used the theater for theatrical purposes from that time until the close of the ordinary theatrical season in 1914, the lease expiring September 1, 1914.

11. In the spring of 1914 Rosenbaum & Company began the erection of a large steel frame building on the lot adjoining the theater on the east side and other adjacent property, and in May, 1914, took down the wall of the adjoining house but had not then excavated the ground adjoining the theater for some distance away from it.

12. On May 21, 1914, S. A. Dies, superintendent of the Bureau of Public Construction of the City of Pittsburgh, sent notice to the defendant and the plaintiff that the tank on the roof should be emptied, stating that the side-

wall was not in condition to carry the tank and that the entire wall was not of good construction and that it ought to be removed. The tank was thereupon emptied.

13. The condition of the wall at this time was a subject upon which a great deal of testimony was taken at the trial. We find the fact to be that the wall had not settled or moved, so far as appeared, since it was built; that the removal of the wall of the adjoining building made no difference in its strength, as the theater wall inclined somewhat away from the adjoining wall and was not supported by it to any appreciable extent, and that so long as the earth was not excavated in the adjoining lot too near the wall the east wall of the theater was safe.

14. On May 25, 1914, proceedings were instituted by the Rosenbaum Company for William Stanton, the owner of the property adjoining the theater, for the erection of a party wall, and on May 29, 1914, it was determined that a party wall should be erected one-half on each side of the line. This proceeding required the removal of the east wall of the theater, as not being proper to form a part of the new building, and the wall was accordingly soon thereafter removed.

15. On or about June 1, 1914, the defendant company applied to the city for a theater license for the month of June, which was refused. It was impracticable and unsafe to occupy the building as a theater during the removal of the wall.

16. The holding of performances in the theater ceased shortly before the 1st of June and the defendant remained in possession of the building, keeping its watchman there as required by the contract, until the 18th of June, 1914, when it notified the plaintiff that they would remove the watchman and would not consider themselves responsible for the rent after the last of May.

17. The lease required the defendant to keep up by new material, replacements and repairs, all carpets, scenery and fixtures, chandeliers, electric lights, etc., and

to make all necessary repairs to the building and premises, and to return the premises in as good and sufficient repair as when received.

18. The lease also required the defendant to keep a watchman on the premises, which was done during the whole time of the lease except between June 18, 1914, and August 31, 1914, during which time the plaintiff kept a watchman there at a cost to him of $291, which was the reasonable value of the services.

19. It is claimed by the plaintiff that there were about fourteen hundred sockets for electric lamps in the theater and that all of these were furnished with lamps at the time of the lease, and that nearly all of these lamps had been taken away and were not replaced at the end of the term. These lamps were worth ten cents apiece. The defendant's evidence tended to show that most of the sockets were filled when they left the theater. That a considerable number of lamps were missing there is no doubt. As we are called on in this matter to perform the functions of a jury, we deem it proper to arrive at a result in such circumstances in the same manner as a jury would be compelled to do, and in that way we find that there were missing, lamps to the value of seventy dollars.

20. When the theater came into possession of defendant under the lease it contained a new velvet carpet on the floor of the value of $777.67, which was worn out and not replaced.

21. When the defendant took possession of the theater under the lease it contained a certain number of pieces of scenery and stage equipment which were used up or removed and not replaced by the defendant. The plaintiff now claims that this equipment and scenery was worth $960. The defendant admits that it was worth $188. No inventory of it appears to have been taken either at the beginning or end of the lease, so that the amount and character of it is difficult to ascertain. Practically all of it was of no value except as material to be

used in making up other scenery. The witnesses varied very materially as to the character and value of the scenery, as well as to the amount of it. Upon an examination of the evidence we are of opinion that the value of this scenery and equipment not replaced was four hundred dollars.

22. Plaintiff claims there were chairs to the value of $120 in this theater at the time it was leased, which were not there at the end of the term. The defendant claims that these chairs were not in the theater when it was leased. As to these chairs we find the plaintiff did not make out a case by the weight of the evidence.

23. Plaintiff also claims fifty dollars for expense of plumbing, in putting in repair a water closet which he claims was out of repair at the expiration of the lease. The evidence that this lack of repair existed before the plaintiff's watchman took charge of the building, or that it was not brought about by workmen engaged in taking down the wall, is not sufficient to charge the defendant on this claim.

24. In addition to these amounts, the parties have agreed that there shall be allowed to the plaintiff the sum of $226.97 for items other than those above mentioned, which is admitted by defendant.

### CONCLUSIONS OF LAW.

First. The only question in the first and second cases under consideration is whether or not the defendant is liable to the plaintiff for the rent for the months of June and July respectively. In the third case the same question arises as to the rent for the month of August and the additional question as to the amount of liability of defendant for not restoring the premises in the same condition as when received.

Second. The reason alleged by defendant for not paying the rent for these three months is that it was induced to enter into the contract of lease by the fraud of the

plaintiff. This fraud consisted, as contended by the defendant, in a statement made by the plaintiff to the defendant some time before the lease was agreed upon or executed, that the theater building was safe, and that the plaintiff either knew or should have known that it was not safe; and that relying upon this representation the lease was made. We have found that he did not represent the building to be safe. Even if he had done so, in the absence of any representation of peculiar knowledge on the subject or a knowledge different from that which anyone might gain by examining the building, we are of opinion that that does not amount to fraud even if the representation turned out to be incorrect. It is not claimed the defendant did not have all opportunity to inspect the building which it desired. The plaintiff's statement that he would not allow any lessee to interfere with his improvements did not refer in any way to the inspection of the building, but meant he would not alter those improvements at the suggestion of a proposed lessee.

Third. The act of the city in notifying the parties to empty the tank on the roof and that the wall was unsafe and must be taken down was not an eviction of the defendant, nor were the proceedings by the adjoining owner for the erection of a party wall, under which the wall of the theater was in fact taken down, such an eviction. In the third case, being that at October Term, 1914, the plaintiff is admittedly entitled to recover some amount. It is admitted, as we understand it, that if the plaintiff is entitled to recover for the rent from June 18th to the end of the term he is also entitled to recover for the services of a watchman, of a value of $291; and if not entitled to recover this rent that he is not entitled to recover this amount for watchman.

Fourth. Without regard to the liability of defendant for the rent, the liability to plaintiff in this third case is, the value of lamps that were not restored, $70; the value of carpet, $777.67; for scenery, $400; and for other

small items contained in the stipulation filed by the parties, $226.97.

Fifth. Being of opinion that the defendant has shown no sufficient defense for the payment of the rent, it is ordered in the case at No. 2142 July Term, 1914, that judgment be entered for the plaintiff and against the defendant for $3,333.33 with interest from June 1, 1914, amounting to $3,710.

Sixth. In the case No. 2515 July Term, 1914, it is ordered that judgment be entered for the plaintiff and against the defendant for $3,333.33 with interest from July 1, 1914, amounting to $3,693.33.

Seventh. In the case No. 1436 October Term, 1914, it is ordered that judgment be entered for the plaintiff and against the defendant for $3,333.33 with interest from August 1, 1914; and the further sums, $291 for watchman, $70 for lamps, $777.67 for carpet, $400 for scenery, and $226.97 for items in stipulation, with interest on all of said amounts from September 1, 1914, being in all the sum of $5,615.33.

Judgments were entered against defendant as set forth in the 5th, 6th and 7th conclusions of law. Defendant appealed.

*Errors assigned* were in dismissing exceptions to findings of fact and law and the judgments of the court.

*W. S. Dalzell*, of *Dalzell, Fisher & Hawkins*, with him *Lazear & Blaxter*, for appellant.

*John M. Freeman*, of *Watson & Freeman*, with him *Francis R. Harbison*, for appellee.

PER CURIAM, January 8, 1917:

These three cases were tried together in the court below, before its president judge, without a jury, under the provisions of the Act of April 22, 1874, P. L. 109, and each judgment is affirmed on the facts found and the legal conclusions reached by him,